**Garnett William CAPE, Petitioner,**

v.

**Robert FRANCIS, Warden, Georgia Diagnostic & Classification Center, Respondent.**

**Civ. A. No. 82–152–ATH.**

United States District Court, M.D. Georgia, Athens Division.

March 9, 1983.

---

Stephen B. Bright, Atlanta, Ga., Robert E. Morin, Washington, D.C., for petitioner.

Mary Beth Westmoreland, Atlanta, Ga., for respondent.

OWENS, Chief Judge:

Since 1867—some one-hundred sixteen years—on account of laws passed by Congress, 28 U.S.C. § 2241, *et seq.*, it has been the responsibility of United States District Courts to consider and decide petitions for writs of habeas corpus filed by state prisoners alleging that they are in custody because of having been tried and convicted in violation of their rights derived from the Constitution or laws of the United States. Some call the performance of this terrible duty "interference by federal courts" in the affairs of the States. Those who are better informed recognize that deciding state habeas cases is just one of many distasteful tasks that Congress has assigned to state citizens serving as United States District Judges and that must be performed by United States District Judges regardless of their personal likes or dislikes.

Pursuant to those laws passed by Congress this petitioner filed a petition for a writ of habeas corpus contending that his conviction for the brutal slaying of his 15-year-old niece and the sentence of death imposed by a jury of his peers should be overturned because of constitutional deficiencies. Pursuant to those same laws passed by Congress, it is this judge's respon-sibility to determine whether or not petitioner has been constitutionally convicted and sentenced to die.

The Supreme Court of the United States in 1976 found that the death penalty "does not invariably violate the [United States] Constitution," 428 U.S. at 169, 96 S.Ct. at 2923, and that Georgia's statutory procedure for determining whether or not the death penalty should be imposed in a particular case is constitutional. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859. In so holding, the Supreme Court, among other things, stated:

"... capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

'The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they "deserve," then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law.' *Furman v. Georgia, supra,* [408 U.S. 238] at 308, 33 L.Ed.2d 346, 92 S.Ct. 2726 [2769] (Stewart, J., concurring).

'Retribution is no longer the dominant objective of the criminal law,' *Williams v. New York,* 337 U.S. 241, 248, 93, 1337, 69 S.Ct. 1079 [1084] (1949), but neither is it a forbidden objective nor one inconsistent with our respect for the dignity of men. *Furman v. Georgia,* 408 U.S., at 394–395, 33 L.Ed.2d 346, 92 S.Ct. 2726 [2806] (Burger, C.J., dissenting); id., at 452–454, 33 L.Ed.2d 346, 92 S.Ct. 2726 [2835–2836] (Powell, J., dissenting); *Powell v. Texas,* 392 U.S. [514] at 531, 535–536, 20 L.Ed.2d 1254, 88 S.Ct. 2145 [2153, 2155–2156]. Indeed, the decision that capital punishment may be the appropriate sanction in

extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death."

Pursuant to the identical statutory procedure found to be constitutional in *Gregg,* petitioner was tried, convicted, and sentenced to death in the Superior Court of Franklin County, Georgia. He appealed his conviction and sentence to the Supreme Court of Georgia. In affirming the conviction and sentence of death the Supreme Court of Georgia first summarized the evidence heard by petitioner's jury:

"From the evidence presented at trial, the jury was authorized to find the following facts:

"The appellant, a 56-year-old male, was the uncle of the victim's mother. He was well acquainted with the victim's family. The victim's father and the appellant had hunted and fished together often. He has socialized with the victim's family on many occasions, and had worked with the victim's brother. He had developed a close relationship with all the members of the family, including the victim, a 15 year old high school student.

"Approximately three months prior to the murder, the appellant had been told by the victim's mother to stay away from the victim. The mother testified that the appellant 'seemed a little too interested in her.' The victim was also told to stay away from the appellant. In response, the appellant ceased visiting the family but continued to see the victim's father and brother at their places of employment.

"The appellant had promised to buy the victim an expensive car. They had looked at the car together. On the 14th of May, the appellant had signed a purchase order. He had asked for a delay in delivery in order to get funds from a Texas bank. It was later established at trial that the appellant did not have such an account.

"On the morning of the murder, the appellant drove the victim and her friend, Tammy Lee Dickerson, to school. He talked to the victim alone in the car for a few minutes after her friend went into the school. The victim was last seen alive leaving school at approximately 3:15 p.m.

"At approximately 4:45 p.m., the appellant came into the victim's brother's place of employment and told him he had 'lost' his sister. The victim's brother noticed that appellant was frightened, nervous, and had cuts on his hands and scratches on his face.

"The appellant explained that he had picked up the victim after school, and had taken her to the courthouse to get her birth certificate, which was required to enable her to obtain a learner's driving permit. He testified that she went into the courthouse but didn't come out, and although he had looked for her, she was missing.

"The victim's brother then began to search for his sister. The appellant had the victim's brother drive him to see a classmate of the victim. Appellant asked her whether the victim was in a good mood that day. Thereafter, the appellant went to the victim's father and, in tears, told him the same story. In response the victim's father told the appellant that, 'You knowed you wasn't suppose to pick her up,' and the appellant replied, 'Yeah, I'll never bother her again, I'll never buy her nothing else.'

"It was established that the victim's mother had gotten the victim a birth certificate and learner's permit the day prior to the murder.

"The victim's brother accompanied by Tammy Lee Dickerson and another young female continued to search for the victim. He had gone to the appellant's house, but finding no one home had not entered. Later, the victim's brother and his companions returned to the appellant's house. He found a note on the back door which read, 'Gone to Anderson. Garnett.' The victim's brother then broke into the house through the front door. He found the front room and kitchen in an unusually neat and clean condition.

"The victim's friend, Tammy Lee Dickerson, found the victim's body upon entering a bedroom. The victim had been beaten and stabbed to death. Her clothes were in disarray, so that she was partially nude. The body had been wrapped in a sheet of black plastic in such a manner that only the upper torso was exposed.

"The local authorities were immediately notified. Close examination of the crime scene revealed bloodstains on the kitchen cabinets, door and ceiling. Attempts had been made to remove them. A mop, towels and male clothing were found with bloodstains on them. The defendant's watch, with bloodstains on the band, was also found. The bloodstains were of the same international blood type as that of the victim. A metal pipe belonging to the appellant was recovered and subsequently determined to be the weapon used to beat the victim.

"The appellant was arrested that night as he drove through Hartwell, Georgia. The officers found a loaded pistol under the seat of appellant's car and the appellant later made the statement that 'if he's of known that the Hartwell Police would-had've done a good job of it and shot him, that he would've pulled his pistol up.'

"The appellant testified in his defense. He repeated the statement he told the victim's brother and father. He further testified that he later returned home and found the victim lying face down and fully clothed in his kitchen; that he tried to wipe the blood from her face but became sick; that although he did not know if the victim was dead or alive he did not call anyone but instead left to go to his sister's house in Hartwell, Georgia, to tell her." *Cape v. State,* 246 Ga. 520, 272 S.E.2d 487 (1980).

and then proceeded, among other things, to review petitioner's sentence in the manner required by the statute found in *Gregg* to be constitutional. In so doing the Supreme Court of Georgia stated:

"III. Sentence Review

"In our sentence review, we have considered the aggravating circumstance found by the jury and the evidence concerning the crime and the defendant. We have reviewed the sentence as required by Ga.L.1973, p. 159 et seq. (Code Ann. § 27–2537(c)(1–3)) as we have in each case involving the death penalty under this statute. We find that the evidence factually substantiates the verdict and supports a finding of guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

"11. Appellant asserts that the sentence of death was imposed under the influence of passion, prejudice and other arbitrary factors because of the cumulative effect of incompetent and inadmissible evidence submitted by the state. He also argues that the jury was impassioned because of the particularly horrible nature of the crime and the age of the victim. After a thorough review of the transcript and record in this case as mandated by our statute, we do not agree. The evidence submitted by the state being found admissible (sic), appellant's enumeration has no merit. Nothing in the record indicates that the jury abdicated its oath and decided sentence upon passion, prejudice or other arbitrary factors. Rather, the finding of the aggravating circumstance set forth below was a logical and rational result based upon the vile, horrible and inhuman nature of the crime. See division 13 below. The appellant attempts to assert the 'Private Slovik Syndrome' for the first time on appeal. This argument has been raised before and decided adversely to appellant. *House v. Stynchcombe,* 239 Ga. 222, 236 S.E.2d 353 (1977). We find that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor.

"12. In his final enumeration of error, the appellant asserts that the death penalty must be set aside because the trial court's instructions to the jury in the sentencing phase of the trial did not provide guidance in the interpretation of Code Ann. 27–2534.1(b)(7), citing the recent case of *Godfrey v. Georgia,* 446

U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). While the trial court did not give a limiting charge on § 27–2534.1(b)(7), we hold that a limiting charge was not required under the facts of this case. *Godfrey v. Georgia,* supra; *Hance v. State,* 245 Ga. 856, 268 S.E.2d 339 (1980). As the Supreme Court of the United States said in *Godfrey v. Georgia,* supra, 'the validity of the petitioner's death sentence turns on whether, in light of the facts and circumstances of the murders . . ., the Georgia Supreme Court can be said to have applied a constitutional construction of [27–2534.1(b)(7)]' As noted in *Godfrey v. Georgia,* supra, the jury there returned a finding that the murder was 'outrageously or wantonly vile, horrible and inhuman.' Torture or aggravated battery was not found as in the case at bar. See division 13 below. Therefore, the Supreme Court of the United States was required to speculate as to the jury's interpretation of the first clause of the statute. As that court said, 'There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death penalty.'

"However, in the case at bar, the jury's finding of the second clause of the statute is supported by the evidence beyond a reasonable doubt, and speculation as to the jury's interpretation of the statute by the reviewing court is not required, thereby allowing rational review of the death sentence. *Godfrey v. Georgia,* supra, is therefore distinguishable from the case at bar, and under the particular facts of this case a limiting charge was not required. See *Hance v. State,* supra; *Harris v. State,* 237 Ga. 718, 230 S.E.2d 1 (1976); *Lamb v. State,* 241 Ga. 10, 243 S.E.2d 59 (1978). This enumeration of error is without merit.

"13. The jury found the following aggravating circumstance:

'The murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind and/or aggravated battery to the victim.'

"Under the evidence in this case, the victim was beaten with an iron pipe. She sustained multiple skull fractures and the force of the attack was so great that the skull was fractured almost in half. The victim sustained bruises on the left shoulder and neck probably as a result of being choked. The tongue and upper lip were bruised and part of the lower lip was swollen. After the victim sustained the head injuries, she was stabbed five times in the back and twice in the chest. Death ensued from the loss of blood.

"When the body was found, it was in a partial state of undress. One breast was exposed and the pants the victim was wearing were unzipped. Forensic evidence suggested the presence of seminal fluid in the oral cavity, but was not conclusive. However, the state of undress, bruising about the mouth, and the suggested presence of seminal fluid would authorize a finding of serious sexual abuse. The victim was a 15-year-old female child.

"By any rational standard the murder was outrageously or wantonly vile, horrible or inhuman. In that respect this murder is distinguishable from ordinary murders in which the death penalty is not appropriate. *Hance v. State,* supra; *Patrick v. State,* 245 Ga. 417, 265 S.E.2d 553 (1980). The victim did not die instantaneously, and while she was distantly related to the appellant, this is not a domestic murder. Nor did the victim give appellant any reason to assault her, and she was not subjecting the appellant to any emotional trauma. The appellant made an elaborate attempt to hide the crime. See *Godfrey v. Georgia,* supra. In *Hance v. State,* supra, this court set out standards which must be met in order to constitutionally apply § 27–2534.1(b)(7) in light of *Godfrey v. Georgia,* supra. We held that torture, as the term is used in the statute, occurs when the victim is subjected, as in this case, to serious physical abuse before death. We also held that serious sexual abuse may be found to constitute serious physical abuse. The evidence supports a finding of serious

physical abuse and serious sexual abuse constituting serious physical abuse. A defendant who tortures the victim or subjects the victim to an aggravated battery before killing the victim can be found to have a depraved mind. The age and physical characteristics of the victim may be considered in determining depravity of mind.

"We find that the evidence factually substantiates and supports the finding of the statutory aggravating circumstances and the sentence of death by a rational trier of fact beyond a reasonable doubt. *Jackson v. Virginia,* supra.

"We have thoroughly reviewed the instruction of the trial court during the sentencing phase of the trial and find that the charge was not subject to the defects dealt with in *Fleming v. State,* 240 Ga. 142, 240 S.E.2d 37 (1978), and *Hawes v. State,* 240 Ga. 327, 240 S.E.2d 833 (1978).

"The murder was a savage sexual assault upon a young child. It was not a crime of passion such as to mitigate the imposition of the death penalty as appellant asserts. The fact that the victim knew and trusted the appellant far from mitigating the crime, as appellant argues, makes the murder more outrageously or wantonly vile, horrible or inhuman.

"In reviewing the death penalty in this case, we have considered the cases appealed to this court since January 1, 1970, in which a death or life sentence was imposed. Contrary to appellant's position, juries have given the death penalty in cases in which the defendant had no prior criminal record. *Tucker v. State,* 244 Ga. 721, 261 S.E.2d 635, supra; *Bowen v. State,* 241 Ga. 492, 246 S.E.2d 322 (1978); *House v. State,* 232 Ga. 140, 205 S.E.2d 217 (1974).

"We find that the following similar cases listed in the appendix support the affirmance of the death penalty. Appellant's sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases considering the crime and the defendant.

"Judgment affirmed.

"All the Justices concur.

## APPENDIX

"*House v. State,* 232 Ga. 140 (205 SE2d 217) (1974); *Gibson v. State,* 236 Ga. 874 (226 SE2d 63) (1976); *Griggs v. State,* 241 Ga. 317 (245 SE2d 269) (1978); *Presnell v. State,* 241 Ga. 49 (243 SE2d 496) (1978); *Johnson v. State,* 242 Ga. 649 (250 SE2d 394) (1978); *Ruffin v. State,* 243 Ga. 95 (252 SE2d 472) (1978); *Collins v. State,* 243 Ga. 291 (253 SE2d 729) (1978); *Bowen v. State,* 244 Ga. 495 (260 SE2d 855) (1979); *Tucker v. State,* 244 Ga. 721 (261 SE2d 635) (1979); *Patrick v. State,* 245 Ga. 417 (265 SE2d 553) (1980); *Thomas v. State,* 245 Ga. 688 (266 SE2d 499) (1980)."

Following denial of his application to the United States Supreme Court for a writ of certiorari, 449 U.S. 1134, 101 S.Ct. 956, 67 L.Ed.2d 121 (1981), petitioner filed a petition for a writ of habeas corpus in the Superior Court of Butts County, Georgia, in which he alleged constitutional errors in addition to those already asserted to and considered by the Supreme Court of Georgia. Superior Court Judge Alex Crumbley permitted counsel to present testimony by deposition, affidavit, and in open court, carefully considered each of petitioner's 57 alleged substantive claims and in 19 legal pages of findings of fact and conclusions of law found no merit to petitioner's claims and denied his application for a writ of habeas corpus. The Supreme Court of Georgia and then the Supreme Court of the United States refused to consider his case and he commenced this habeas corpus proceeding.

## THE CONCEPT OF REVIEW IN THIS COURT

As stated at the outset, this habeas corpus proceeding is in this court pursuant to laws passed by Congress. As amended in 1966 by the adoption of § 2254(d), those laws prescribe the basis for relief in this court and the extent to which the findings of the Supreme Court of Georgia and the Superior Court of Butts County, Georgia,

are to be relied upon by this United States District Court, to wit:

"28 U.S.C. § 2254. State custody; remedies in Federal courts

"(a) The Supreme Court, a Justice thereof, a circuit judge, or *a district court shall entertain* an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in *violation of the Constitution or laws or treaties of the United States.*

\* \* \* \* \* \*

"(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, *a determination* after a hearing on the merits of a factual issue, *made by a State court* of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, *shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear,* or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record. And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, *the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.*"

\* \* \* (emphasis added)

In 1981 the Supreme Court of the United States in *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722, explained the role, effect, and requirements of 28 U.S.C. 2254(d) as follows:

"Section 2254(d) applies to cases in which a state court of competent jurisdiction has made 'a determination after a hearing on the merits of a factual issue.' *It makes no distinction between the factual determinations of a state trial court and those of a state appellate court.* Nor does it specify any procedural requirements that must be satisfied for there to be a 'hearing on the merits of a factual issue,' other than the habeas applicant and the State or its agent be parties to the state proceeding and that the state-court determination be evidenced by 'a written finding, written opinion, or other

reliable and adequate written indicia.' Section 2254(d) by its terms thus applies to factual determinations made by state courts, whether the court be a trial court or an appellate court. Cf. *Swenson v. Stidham,* 409 U.S. 224, 230, 34 L.Ed.2d 431, 93 S.Ct. 359 [363] (1972). This interest in federalism recognized by Congress in enacting *§ 2254(d) requires deference by federal courts to factual determinations of all state courts.*

\* \* \* \* \* \*

When Congress provided in § 2254(d) that a habeas court could not dispense with the 'presumption of correctness' embodied therein unless it concluded that the factual determinations were not supported by the record, it contemplated at least some reasoned written references to § 2254(d) and the state-court findings. State judges as well as federal judges swear allegiance to the Constitution of the United States, and there is no reason to think that because of their frequent differences of opinions as to how that document should be interpreted that all are not doing their mortal best to discharge their oath of office.

"Federal habeas has been a source of friction between state and federal courts and Congress obviously meant to alleviate some of that friction when it enacted subsection (d) in 1966 as an amendment to the original Federal Habeas Act of 1867. Accordingly, some content must be given to the provisions of the subsection if the will of Congress be not frustrated. Since the 1966 amendment, this Court has had few opportunities to address the various provisions of subsection (d), and never in a context similar to the one presented here. See, e.g., *Cuyler v. Sullivan,* 446 U.S. 335, 64 L.Ed.2d 333, 100 S.Ct. 1708 (1980); *LaVallee v. Delle Rose,* 410 U.S. 690, 35 L.Ed.2d 637, 93 S.Ct. 1203 (1973). A writ issued at the behest of a petitioner under 28 USC § 2254 [28 USCS § 2254] is in effect overturning either the factual or legal conclusions reached by the state-court system under the judgment of which the petitioner stands convicted,

and friction is a likely result. The long line of our cases previously referred to accepted that friction as a necessary consequence of the Federal Habeas Act of 1867, 28 USC § 2254 [28 USCS § 2254]. But it is clear that in adopting the 1966 amendment, Congress in § 2254(d) intended not only to minimize that inevitable friction but also to establish that the findings made by the state-court system 'shall be presumed to be correct' unless one of seven conditions specifically set forth in § 2254(d) was found to exist by the federal habeas court. If none of those seven conditions were found to exist, or unless the habeas court concludes that the relevant state-court determination is not 'fairly supported by the record,' 'the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.'

\* \* \* \* \* \*

"When it enacted the 1966 amendment to 28 USC § 2254 [28 USCS § 2254], Congress specified that in the absence of the previously enumerated factors one through eight, the burden shall rest on the habeas petitioner, whose case by that time had run the entire gamut of a state judicial system, to establish 'by convincing evidence that the factual determination of the State court was erroneous.' 28 USC § 2254(d) [28 USCS § 2254(d)]. Thus, Congress meant to insure that a state finding not be overturned merely on the basis of the usual 'preponderance of the evidence' standard in such a situation. In order to ensure that this mandate of Congress is enforced, we now hold that a habeas court should include in its opinion granting the writ the reasoning which led it to conclude that any of the first seven factors were present, or the reasoning which led it to conclude that the state finding was 'not fairly supported by the record.' Such a statement tying the generalities of § 2254(d) to the particular facts of the case at hand will not, we think, unduly burden federal habeas courts even though it will prevent the use

of the 'boilerplate' language to which we have previously adverted.

"It is so ordered.

"Justice Blackmun concurs in the result. He would vacate the judgment of the Court of Appeals and merely remand the case to that court for reconsideration in light of 28 USC § 2254(d) [28 USCS § 2254(d)].

## SEPARATE OPINION

"Justice Brennan, with whom Justice Marshall and Justice Stevens join, dissenting.

"The Court holds today that an order of a federal habeas court requiring release or retrial of a state prisoner because of constitutional violations at his trial must be vacated if the court does not explain in its order why 28 USC § 2254(d) [28 USCS § 2254(d)] does not bar re-examination of issues decided by the state courts—even if the State did not contest the order on the ground of § 2254(d), and even if § 2254(d) is plainly inapplicable under decisions of this Court. I dissent." (emphasis added).

Also see *Marshall v. Lonberger,* —— U.S. ——, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

## THE EFFECT OF § 2254(d) ON PETITIONER'S CASE

By order dated February 25, 1983, after reading the transcripts of petitioner's state trial and habeas proceedings and everything else included in the file of petitioner's case this court concluded that petitioner received the full and fair evidentiary hearing that is mandated by *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), 28 U.S.C. § 2254(d), and the most recent opinions of the Eleventh Circuit Court of Appeals, *see, Thomas v. Zant,* 697 F.2d 977 (11th Cir.1983); and denied petitioner's motion for a further evidentiary hearing before this court.

 Represented by very capable volunteer counsel, petitioner has not begun to carry his burden of establishing by convincing evidence that any of the factual determinations of the state courts were erroneous. Petitioner has not shown the existence of any of the circumstances set forth in § 2254(d)(1) through (7). This court has read and carefully examined the record of the state court proceedings and has concluded that the record, considered as a whole, fairly supports the factual determinations of the Supreme Court of Georgia and the Superior Court of Butts County. Those factual determinations are thus presumptively correct under 28 U.S.C. § 2254(d). It thus remains for this court to consider petitioner's many contentions of error by the Supreme Court of Georgia and the Superior Court of Butts County in applying the Constitution of the United States, as interpreted by the Supreme Court and Courts of Appeal, to the presumptively correct facts of his case, keeping in mind that "a court need not elaborate or give reasons for rejecting claims which it regards as frivolous or totally without merit...." *Sumner v. Mata,* 449 U.S. at 548, 101 S.Ct. at 770, 66 L.Ed.2d at 732.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In paragraphs 26 through 35 petitioner asserts, generally and by citation to specific alleged omissions of his public defender counsel and his additional family-retained counsel, that he did not receive the reasonably effective assistance of counsel guaranteed to him by the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States.

As the Eleventh Circuit Court of Appeals sitting *en banc* recently stated in *Washington v. Strickland,* 693 F.2d 1243 (1982):

"The sixth amendment guarantees to criminal defendants the right to assistance of counsel. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). A vital corollary to this guarantee is the requirement of effective assistance of counsel, that is, counsel reasonably likely to render and rendering reasonably effective assistance given the totality of the circumstances. See, e.g., *Herring v. Estelle,* 491 F.2d 125, 127 (5th

Cir.1974); *MacKenna v. Ellis,* 280 F.2d 592, 599 (5th Cir.1960), adhered to en banc, 289 F.2d 928 (5th Cir.), cert. denied, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). See also *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). A petitioner who seeks to overturn his conviction on grounds of ineffective assistance of counsel must prove his entitlement to relief by a preponderance of the evidence.[11] *United States v. Killian,* 639 F.2d 206, 210 (5th Cir.), cert. denied, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); *Mays v. Balkcom,* 631 F.2d 48, 52 n. 1 (5th Cir. 1980); *Marino v. United States,* 600 F.2d 462, 464 (5th Cir.1979).[12]

[11] This burden of persuasion can be phrased alternatively as the burden to rebut the presumption of attorney competence. See *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955); *Cox v. Wyrick,* 642 F.2d 222, 226 (8th Cir.), cert. denied, 451 U.S. 1021, 101 S.Ct. 3013, 69 L.Ed.2d 394 (1981); *United States v. Garcia,* 625 F.2d 162, 170 (7th Cir.), cert. denied, 449 U.S. 923, 101 S.Ct. 325, 66 L.Ed.2d 152 (1980).

[12] Washington urges us to apply a special set of rules regarding ineffective assistance of counsel to capital cases. The court has rejected similar advice from another petitioner in *Washington v. Watkins,* 655 F.2d 1346, 1356–57 (5th Cir.1981), cert. denied, 456. U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982), and we do so again here. The relevant inquiry in all cases involving claims of ineffectiveness of counsel, irrespective of the degree of punishment that the state seeks to impose, is whether counsel rendered reasonably effective assistance given the totality of the circumstances. The degree of punishment is but one of the totality of circumstances. See also *Gray v. Lucas,* 677 F.2d 1086, 1092 (5th Cir.1982)."

Assuming that the petitioner proves a violation of his right to effective assistance of counsel, it is then his burden

"... to demonstrate that the ineffective assistance created not only 'a possibility of prejudice, but that [it] worked to his actual and substantial disadvantage.' See *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982) (emphasis in original). If he successfully satisfies this burden, the writ must be granted unless the state proves that counsel's ineffectiveness was harm-

less beyond a reasonable doubt. See *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)." Id. at 1258.

■ In claiming ineffective assistance of counsel petitioner first claims that counsel ineffectively failed to present evidence which would have supported the motion for change of venue that counsel did make and urge upon the trial court. (Trial Tr. 236). In support of this claim petitioner presents conclusory affidavits as to the attitude of the community, but presents nothing specific to indicate that petitioner received anything other than a trial before a fair and impartial jury that was chosen despite substantial pretrial publicity. *See, Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Whitus v. Balkcom,* 333 F.2d 496 (5th Cir.1964); *Goins v. McKeen,* 605 F.2d 947 (6th Cir.1979); and, *Brinlee v. Crisp,* 608 F.2d 839 (10th Cir.1979). Further, petitioner presents no specific evidence which was known by or available to his counsel and which, if presented, would have mandated a change of the venue of his trial.

■ Petitioner next suggests that counsel for petitioner failed to investigate and prepare to cross-examine the State's serologist on the issue of possible sexual abuse and/or torture and that counsel did not seek to retain or present an expert to refute the State's expert.

The State's expert, a forensic serologist, testified that she received swabs from Dr. Dawson, who performed the autopsy of the victim and ran tests. She testified:

"Q. And what were the results of your tests?

A. The examination of the vaginal swab failed to reveal the presence of seminal fluid. The chemical examination of the oral swabs weakly suggest the presence of seminal fluid. The microscopic examination of the smears, Crime Lab Items Number 4 and 5, fails to reveal the presence of spermatozoa.

Q. Now, I believe you said in one of your items there was a weakly presence of fluid?

A. That is true.

Q. Could you explain what you mean when you say it was weakly present?

A. When examining an item for seminal fluid, I do several chemical tests. On this particular swab, the oral swab, I did our first chemical test, which is called an acid phosphatase. This chemical test was positive. From then on, I'll continue to do other chemical tests, and do a microscopic examination for spermatozoa. The microscopic examination was negative. I then did one more test, which was also negative. Therefore, since the first chemical test was positive, I would report it out as 'weakly suggests.'

Q. Now, in layman's terms, tell the jury exactly what you're talking about, what you found, and so forth.

A. I found the presence of a chemical, acid phosphatase, which occurs in high concentrations in seminal fluid, but it's found in lower concentrations in other body fluids. This is why I could not positively say that it was seminal fluid." Trial Transcript p. 346 and 347.

Following further testimony as to the identification of blood and blood samples of the victim and the defendant, petitioner's public defender counsel cross-examined the State's expert. His "from A to Z" cross-examination evidenced superb preparation for cross-examination and resulted in the expert admitting that she could neither confirm nor deny that it was seminal fluid, and further testifying that no spermatozoa were present. (Trial Tr. p. 380).

Viewed realistically in the light of the pictorial and testimonial description of the condition of the body of the deceased, all of which leads to irrefutable proof of the murder being "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, and/or aggrava-ted battery to the victim" (Trial Tr. p. 816)—the aggravated circumstance the State was endeavoring to prove—the testimony of the serologist about seminal fluid was not damaging to the petitioner. Rather than highlighting and emphasizing that non-damaging testimony by attempting to call a defense expert witness, counsel very wisely "left good enough alone." Instead of being criticized he should be commended for the skill and good judgment that he exhibited in handling this State witness.

Ineffectiveness is also claimed because of failure to object to the testimony of petitioner's former daughter-in-law as to petitioner's sexual advances towards her in 1975. A motion to strike was made and granted, and the jury was instructed to disregard the testimony. (Trial Tr. pp. 706–709).

Any experienced trial lawyer or judge who reads these transcripts and examines the pictures of the deceased would conclude that the only possible evidence that could be presented for the petitioner was evidence of good character. Counsel for petitioner called nine witnesses, each of whom testified as to petitioner's good reputation and to the absence of a reputation for violence. (Trial Tr. pp. 586–604). Petitioner then testified as to his life history—birth in Franklin County, education, family, armed forces, work, marriage, son, assistance to family members, divorce, no prior trouble with law, grandchildren—his relationship with the deceased and her family, the attempt to purchase a car for the deceased, and his whereabouts and conduct the day of the murder.

■ Petitioner having put his character in issue, the door was open for rebuttal evidence to be presented by the State. See, Scarver v. State, 130 Ga.App. 297, 202 S.E.2d 850 (1973). When the defendant has placed his own character in evidence, admission of other transactions showing traits involved in the commission of the offense on trial is permitted under Georgia law. Borders v. State, 114 Ga.App. 90, 150 S.E.2d 306 (1966). This case involved a 56-year-old

man shown by the evidence to be enamored with his 15-year-old niece. His general propensity to make sexual advances to other women in his family was evidence that could have been admitted under Georgia law. Counsel's failure to object to admissible evidence can hardly be called an act of ineffectiveness.

Assuming that petitioner's position that this evidence was inadmissible is correct, petitioner's counsel did move to strike the testimony, the trial judge granted the motion, and the jury was instructed as follows:

"THE COURT: Now, ladies and gentlemen of the jury, on yesterday afternoon on Rebuttal the State called a witness named Ola Vernelle Cape. She testified without objection by the Defendant. After studying her testimony, the Court is going to direct you, and I do hereby direct you, that I am striking her testimony in its entirety. You will disregard her testimony and not consider it in the least in your decision in this case, and disabuse your mind of it completely. This is the instruction of the Court to you." (Trial Tr. 709).

The trial judge's instruction was appropriate and sufficient to cure any error that may have occurred. In any event the admission of this evidence and the granting of a motion to strike—in this court's best judgment—did not result in a denial of the fundamental fairness in the trial process that the Due Process Clause guarantees petitioners. *See, Woods v. Estelle,* 547 F.2d 269 (5th Cir.1977), *cert. denied* 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188.

Counsel—according to petitioner— failed in several other respects—(a) didn't request a jury instruction on good character or object to the instruction given, (b) failed to investigate information that could have been presented in mitigation and failed to adequately prepare and question family member witnesses, (c) failed to object to G.B.I. Agent Patterson's testimony, and (d) failed to request a jury instruction on specific mitigating circumstances to be considered by the jury.

■ Petitioner's counsel did submit a request for a good character instruction, Exhibit 2 p. 40, but did not object to the charge given by the court, to wit:

"Now, ladies and gentlemen of the jury, I charge you that whether or not the Defendant has any other defense, and *regardless of whether or not there's any other evidence* in the record *upon which a reasonable doubt as to his guilt could be based, proof of good character may of itself constitute such a defense in his behalf,* and you the jury, *overriding any amount of positive evidence pointing to the guilt of the Defendant,* may if you see fit acquit the Defendant upon a reasonable doubt and proof of good character generated in your mind." (Trial Tr. p. 771) (emphasis added).

While the trial judge did not give the requested instruction and inartfully phrased the given instruction, the essence of the instruction is the same as the requested instruction—proof of good character alone may override all other evidence of guilt and be the basis for a finding of reasonable doubt and acquittal of the petitioner. The message that petitioner wanted the jury to have was transmitted. There was no reason for counsel to object.

Petitioner's counsel repeatedly urges errors of commission and omission in the presentation of evidence of mitigating circumstances but never discusses whether or not the unpresented evidence constitutes evidence of mitigating circumstances. What are mitigating circumstances?

■ The most appropriate definition is found in Bouvier's Law Dictionary, 3rd Edition, under mitigation:

"MITIGATION. Reduction; diminution; lessening of the amount of a penalty or punishment.

Circumstances which do not amount to a justification or excuse of the act committed may yet be properly considered in mitigation of the punishment: as, for example, the fact that one who stole a loaf of bread was starving."

Particularly appropriate is the example given—"the fact that one who stole a loaf of bread was starving." This suggests that mitigating circumstances includes circumstances surrounding the commission of the crime as contrasted with the life history of the petitioner preceding the period of time possibly relevant to the commission of the offense in question. This is consistent with the enumeration of possible mitigating circumstances in the Model Penal Code and quoted in fn. 44 of the Supreme Court's opinion in *Gregg v. Georgia:*

" '(4) Mitigating Circumstances. .

'(a) The defendant has no significant history of prior criminal activity.

'(b) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

'(c) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

'(d) The murder was committed under circumstances which the defendant believed to provide a moral justification or extenuation for his conduct.

'(e) The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor.

'(f) The defendant acted under duress or under the domination of another person.

'(g) At the time of the murder, the capacity of the defendant to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication.

'(h) The youth of the defendant at the time of the crime.' ALI, Model Penal Code § 210.6 (Proposed Official Draft 1962)."

428 U.S. at 194, 96 S.Ct. at 2935, 49 L.Ed.2d at 886. While this enumeration includes "no significant history of criminal activity," it obviously does not encompass the petitioner's life story as told not only by the petitioner—as in this case—but also by every friend and member of the family who wishes to testify. Between these extremes the lawyer for the petitioner must exercise reasonable good judgment in presenting such evidence as can possibly cause the jury to look upon petitioner as a person who, in spite of the terrible crime he committed, should be allowed to live. This lawyer presented nine character witnesses, the petitioner and his life story, two sisters and two brothers of the petitioner, and the petitioner a second time—all to attest to his good character and habits preceding the day in question. Petitioner's lawyer, in this court's opinion, exercised reasonable good judgment in presenting all of these mitigating circumstances and cannot now be faulted for failing to present more.

Having carefully considered the State habeas findings of fact, read this entire transcript, and noted public defender counsel's careful trial preparation, numerous appropriate pre-trial motions, effective cross-examination of defense witnesses, constant appropriate legal objections, and skillful presentation of petitioner and his many character and mitigating circumstances and argument; this judge concludes that petitioner's public defender counsel's and family-retained counsel's conduct of this petitioner's trial amounted to the "reasonably effective assistance given the totality of the circumstances" that petitioner is guaranteed by the Constitution of the United States.

Assuming that this conclusion is unfounded, whatever petitioner's counsel failed to do unquestionably did not work to petitioner's actual and substantial disadvantage.

Petitioner is not entitled to a writ of habeas corpus on the ground of ineffective assistance of counsel.

## MISCELLANEOUS CLAIMS

For reasons already stated petitioner, having been tried before a fair and impartial jury of his peers, has no basis for complaining of the failure of the trial court to grant his motion for change of venue.

Petitioner's brief contains no authority in support of his claim entitled "The Death-

Qualification of Petitioner's Jury" and this court, regardless thereof, finds no possible merit in those complaints.

■ In complaining of the failure of the trial judge to allow jurors to be privately and individually *voir dire* on matters other than their attitude toward the death penalty, petitioner's counsel cites numerous cases which have found that "under certain circumstances individual sequestered *voir dire* was necessary. (citations omitted)" p. 45 of brief. Most of those cases are federal prosecutions and appeals; several are state appellate decisions. None of them support the proposition that individual sequestered *voir dire* is constitutionally required. In this case the absence of additional individual *voir dire* of the jurors did not deprive petitioner of a constitutionally fair trial.

■ Petitioner's complaints that the testimony of the forensic serologist was prejudicial and inflammatory and denied him a fair trial and a reliable determination of punishment. To begin with, the evidence was clearly admissible. Petitioner's other complaints as to evidence also concern evidence that petitioner would prefer to exclude, but which was clearly relevant and admissible. There is no basis for complaint.

■ Preceding the jury hearing evidence of statements made by the petitioner after his arrest in Hartwell, Georgia, some eleven miles from his Lavonia home, the trial judge conducted a *Jackson v. Denno* hearing and concluded that his statements were voluntarily made. (Trial Tr. p. 452). The record supports the trial judge's conclusion.

■ Since petitioner concurred in the trial court ordering him psychiatrically examined (Trial Tr. p. 9A) and the psychiatrist's testimony consisted only of his professional opinion of the competency of petitioner (Trial Tr. p. 562), there is absolutely no merit in petitioner's allegation that his Fifth Amendment rights were violated by the testimony of the psychiatrist. *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

■ As the Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, stated in its opinion approving constitutionally of the procedure utilized in petitioner's case:

"Furman mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U.S. at 189, [96 S.Ct. at 2932] 49 L.Ed.2d at 883.

\* \* \* \* \* \*

"We now turn to consideration of the constitutionality of Georgia's capital-sentencing procedures. In the wake of Furman, Georgia amended its capital punishment statute, but chose not to narrow the scope of its murder provisions. See Part II, supra. Thus, now as before Furman, in Georgia '[a] person commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being.' Ga.Code Ann., § 26–1101(a) (1972). All persons convicted of murder 'shall be punished by death or by imprisonment for life.' § 26–1101(c) (1972).

"Georgia did act, however, to narrow the class of murderers subject to capital punishment by specifying 10 statutory aggravating circumstances, one of which must be found by the jury to exist beyond a reasonable doubt before a death sentence can ever be imposed. *In addition, the jury is authorized to consider any other appropriate aggravating or mitigating circumstances.* § 27–2534.-1(b) (Supp.1975). The jury is not required to find any mitigating circumstance in order to make a recommendation of mercy that is binding on the trial court, see § 27–2302 (Supp.1975), *but it must find a statutory aggravating circumstance before recommending a sentence of death.*

"These procedures require the jury to consider the circumstances of the crime and the criminal before it recommends

sentence. No longer can a Georgia jury do as Furman's jury did: reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die. Instead, the jury's attention is directed to the specific circumstances of the crime: Was it committed in the course of another capital felony? Was it committed for money? Was it committed upon a peace officer or judicial officer? Was it committed in a particularly heinous way or in a manner that endangered the lives of many persons? In addition, the jury's attention is focused on the characteristics of the person who committed the crime: Does he have a record of prior convictions for capital offenses? Are there any special facts about this defendant that mitigate against imposing capital punishment (e.g., his youth, the extent of his cooperation with the police, his emotional state at the time of the crime). As a result, while some jury discretion still exists, 'the discretion to be exercised is controlled by clear and objective standards so as to produce non-discriminatory application.' *Coley v. State,* 231 Ga. 829, 834, 204 S.E.2d 612, 615 (1974)." 428 U.S. at 196, 96 S.Ct. at 2936, 49 L.Ed.2d at 887. (emphasis added).

Petitioner's complaint that Georgia's procedure suffers from the defects found in Florida's procedure (which lacks the underlined requirements) in *Henry v. Wainwright,* 661 F.2d 56 (5th Cir.1981) is patently frivolous.

The prosecution fairly argued in behalf of the State; petitioner's complaints of constitutional unfairness are meritless.

 Neither *Gregg v. Georgia, supra,* nor *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398, require the trial judge in this type case to define Georgia's (b)(7) aggravating circumstance. Any juror is capable of determining whether or not this murder was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, and/or aggravated battery to the victim." Petitioner additionally contends that the trial judge should have given clearer guidance to the jury as to the mitigating circumstances they were to consider. As indicated in the earlier portion of this opinion, there is no specific, accepted definition of mitigating circumstances. Rather than get embroiled in argument over such a definition this trial judge very wisely, and in this judge's opinion, correctly told petitioner's jury:

"Now, ladies and gentlemen of the jury, you should consider all the evidence submitted to you in both phases of the trial of this case in arriving at your verdict as to sentence to be imposed. This would include any evidence of mitigating circumstances received by you in this case.

"Now, ladies and gentlemen of the jury, even if you find beyond a reasonable doubt that the State has proved the existence of aggravating circumstances or circumstances in this case which would justify the imposition of the death sentence, you are not required to recommend that the accused be put to death. You would be authorized under these circumstances to recommend the death penalty but you are not required to do so. You shall consider, ladies and gentlemen, any mitigating circumstances. *Mitigating circumstances are those circumstances which in fairness and mercy shall be considered by you in fixing the punishment.* You may if you see fit—and this is a matter entirely within your discretion—provide for a life sentence for the accused based upon any mitigating circumstance or reason satisfactory to you, or without any reason, if you see fit to do so. You may recommend life imprisonment even though you have found the aggravating circumstance given to you in this Charge to have existed beyond a reasonable doubt.

"The law vests the exclusive right with the jury to either make or withhold a recommendation for the death sentence. Of course, if the State has failed to prove beyond a reasonable doubt that the offense was committed under the aggravated circumstance described to you, you are not authorized to recommend the

death penalty. Without such a finding, the death penalty cannot be imposed. In that event, you would leave your verdict in the form which you have returned it, that is: 'We, the jury, have found the Defendant guilty,' the effect of which would be that the Court would sentence this Defendant to life in prison." (Trial Tr. p. 813) (emphasis added).

There being no possible merit to petitioner's claims enumerated in paragraphs 71 and 72; 75–81; 82 and 83; and 84–87, each of which has been carefully considered, the only remaining claim is that the evidence is insufficient to support the verdict.

### SUFFICIENCY OF THE EVIDENCE

As the Supreme Court of Georgia noted in its opinion affirming petitioner's conviction, 272 S.E.2d at 485, *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, the United States Supreme Court's 1979 decision, requires a federal court reviewing the constitutional validity of a state prisoner's conviction to utilize the following test in judging the sufficiency of the evidence:

"... the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson v. Louisiana,* 406 U.S. [356], at 362, 32 L.Ed.2d 152, 92 S.Ct. 1620 [1624]. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." 443 U.S. at 319, 99 S.Ct. at 2789, 66 L.Ed.2d at 573.

Judicial review of all the evidence in the light most favorable to the prosecution leads to the inescapable conclusion that any rational trier of fact could have found the essential elements of murder and of the (b)(7) aggravating circumstance beyond a reasonable doubt.

Petitioner's many claims asserted effectively by several very competent lawyers have been fairly considered and rejected by the Superior Court of Franklin County, the Supreme Court of Georgia, and the Superior Court of Butts County.

For the reasons herein stated, this court also believes this petitioner has been constitutionally tried, convicted, and sentenced to die. His petition for a writ of habeas corpus is therefore DENIED.